IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| A2D TECHNOLOGIES, INC.<br>      Plaintiff,<br>vs.<br><br>M.J. SYSTEMS, INC. AND<br>PETROFICHE, INC. d/b/a<br>M.J. SYSTEMS, INC.<br>      Defendants. | CASE NO. _____<br><br><br>District Judge _____<br><br><br>JURY DEMANDED |

### PLAINTIFF'S COMPLAINT

Plaintiff A2D Technologies, Inc. (hereinafter "A2D"), for its Complaint against Defendants Petrofiche, Inc., doing business as M.J. Systems, Inc. and M.J. Systems, Inc (hereinafter collectively "MJ"), states and alleges the following:

### PARTIES

1. Plaintiff A2D is a domestic corporation, incorporated in the State of Texas and has a principal place of business in Humble, Texas.

2. Defendant Petrofiche, Inc., doing business as M. J. Systems, Inc., is a foreign corporation incorporated in Colorado with a principal place of business at 5085 Oakland St., Denver, Colorado 80239. Petrofiche, Inc., doing business as M. J. System's, Inc., had authority to do business in Texas that expired in 1995. Petrofiche, Inc. may be served with process through its registered agent, Samuel David Cheris, at 8505 E. Alameda Ave., Suite 2316, Denver, Colorado 80239.

3. Upon information and belief, Defendant M. J. Systems, Inc., is a foreign corporation incorporated in Colorado with a principal place of business at 5085 Oakland St.,

Denver, Colorado 80239. Upon information and belief, M.J. Systems, Inc. was merged with its successor-in-interest Petrofiche, Inc. and therefore, may be served with process through Samuel David Cheris, at 8505 E. Alameda Ave., Suite 2316, Denver, Colorado 80239.

## JURISDICTION AND VENUE

4.　　This Court has subject matter jurisdiction over this dispute under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and under 28 U.S.C. §§ 1331 and 1338(b). Jurisdiction of this Court is also based on 28 U.S.C. § 1332 (Diversity of Citizenship). The amount in question exceeds $75,000. Supplemental jurisdiction over the state law claims is proper pursuant to 28 U.S.C. § 1367.

5.　　On information and belief, MJ's activities include the reproduction of well logs, including Riley well logs, obtained in Texas and/or distributed to Texas oil and gas companies in Houston, Texas. Venue is therefore, proper in this district under 28 U.S.C. § 1391(b) and (c).

## FACTS

6.　　In 1993, A2D was formed and offered the first internet delivery vehicle for well log data referred to in the trade as LOG-LINE.™ A2D's current digital well log database includes one of the largest data sets for the Gulf of Mexico, the Permian Basin, the Gulf Coast, and Rocky Mountains/Mid-Continent regions. A2D also offers custom and large volume digitizing services and integrated solutions for data management which utilize and employ its proprietary software. A2D's services include well log data management which enables A2D to clean up, index, and digitize a customer's well log data in order that it may be downloaded into the LOG-LINE™ database and provided in a convenient format to its customers. A2D currently serves customers from offices in Houston, Denver, New Orleans, and Oklahoma City.

7. In 2003, A2D acquired Riley's Electric Log, Inc. ("Riley"). Since 1948, Riley had been engaged in the business of collecting, enhancing, and selling copies of well logs. As a critical part of its business, Riley expended substantial effort to collect logs from non-public sources, including well operators and other interested holders in a particular well. These efforts resulted in the expenditure of significant sums of money and other resources, including human resources, to track down and obtain original well logs from the field.

8. Prior to well logs becoming publicly available due to statutory filing requirements in different states, the only practical source of a well log was from a private source, such as Riley, which had to collect logs from non-public sources before making them available to customers.

9. Before many jurisdictions, like Texas in September of 1985, implemented statutory filing requirements for well logs prepared by owners and/or operators, Riley collected millions of logs from private sources. These logs remain extremely valuable to the oil industry because they were never required to be filed with a public agency.

10. Even after September 1, 1985, the regulations within the State of Texas only required one (1) log per well to be filed and often times that regulation was loosely enforced. The well operator was not required to file all logs nor the best log. Even if a log for a well was filed with the Texas Railroad Commission, there were many other logs not filed with the public records. Riley undertook to also collect these non-public logs.

11. In addition to expending substantial resources to collect the well logs, Riley also made significant enhancements to improve the well logs. For example, Riley took the paper logs and made specific enhancements during the process of creating a film "master" of those logs. Riley did this by adjusting the aperture and the focus to enhance the readability of

the logs and to reduce the logs into a smaller, more useable, format known in the industry as a "Half-Scale" log. "Half-Scale" is also known in the industry as "Riley-Scale."

12. Riley made additional enhancements during the process of making a copy from the new master by use of such things as speed, lamp intensity, paper coating, bleed bath and fixer. Riley's work in creating new "improved" well logs provided enhancements to the readability of the paper logs that are not present in the original well logs. Riley's expenditure of tremendous money and effort in obtaining the underlying data and enhancing it enabled the well log information to be available to the public, through Riley, in a better format.

13. During the enhancement stage, Riley also placed its name and logo on the logs with an index number to assist the customer in identifying the well logs as Riley logs. Riley's indicia (mark) gave the customer assurances that the well logs were Riley logs and were a quality product.

14. Riley was recognized as an extremely reliable source of well logs and maintained a good reputation for quality in the industry. Riley cultivated that reputation for 55 years. It was extremely important to Riley's reputation and business success that others not be allowed to copy and sell the Riley logs, and thereby "steal" Riley's efforts and unfairly compete with Riley by avoiding the costs incurred by Riley while at the same time reaping the benefits of Riley's work.

15. Riley sold copies of its logs to customers, which were sold on the basis that the copies would be used solely by the customer for its own use and would not be redistributed, remarketed, or otherwise made available to any entity that would seek to use, redistribute, or remarket the well logs.

16. Riley's invoices reinforce the contractual prohibition against reproduction of well logs purchased by its customers. Riley's invoices generally state that the customer agrees not to transfer any image of a Riley log into any medium which permits the log to be reproduced or used by another for the purpose of resale or augmenting a competing database. The Riley well logs also include a conspicuous statement on the face of the well log that reproduction is prohibited.

17. In 1983, Riley filed suit against MJ based on MJ's reproduction and distribution practices, which used Riley's logs and the Riley mark ("1983 Suit"). Riley claimed MJ reproduced and/or distributed microfiche copies of Riley logs, including the Riley mark, and that the microfiche copies were of a different (inferior) quality and nature than Riley's logs and that the microfiche copies could be used to make paper copies of the well logs.

18. In 1984, Riley and MJ entered into a Settlement Agreement ("1984 Agreement") disposing of claims that had been brought in the 1983 Suit. See EXHIBIT 1. Pursuant to Paragraph 2 of the 1984 Agreement, MJ was required to use its best efforts to prevent "any of RILEY'S MARKS from appearing on any product made or caused to be made by or on behalf of MJ from and after the date above written [March 16, 1984]."

19. Pursuant to Section 8 of the 1984 Agreement, A2D, as Riley's successor-in-interest, is entitled to specific performance of the MJ obligations if MJ has not cured its default within fifteen (15) days of its receipt of written notice thereof.

20. Based on information from A2D's well log data management personnel who manage customer well logs, which include MJ well logs, MJ continues to reproduce and distribute inferior copies of Riley logs, similar to those attached to Exhibit 1, that contain the Riley mark in violation of the 1984 Agreement and other statutory and common law provisions.

MJ's blatant disregard for A2D's rights and use of the Riley mark is particularly egregious in view of its use of the same prohibitions against reproduction and use of well logs, including well logs with the Riley mark, it provides in its customer agreements.

## COUNT I.

## LANHAM ACT

21.   A2D repeats and realleges as if fully set forth herein the allegations of paragraphs 1 through 20 above.

22.   MJ's unauthorized reproduction and distribution of well logs bearing the Riley mark is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of MJ with A2D, and as to origin, sponsorship or approval of MJ's services and other commercial activity within the meaning of 15 U.S.C. § 1125(a).

23.   Moreover, upon information and belief, MJ's addition of its own indicia (mark), suggesting that it reproduced the well logs it provides its customers from original Riley logs and/or was authorized by Riley to reproduce such logs, is further calculated to cause confusion and deceive its customers as to the origin of such well logs and/or Riley's (A2D's) sponsorship and/or approval of MJ's reproduction of the Riley logs.  MJ's unauthorized use of the Riley mark, and use of its own mark, on inferior well logs diminishes the goodwill and reputation associated with Riley products bearing the Riley mark.

24.   MJ willfully intended to trade on Riley's goodwill and reputation and/or sought to cause dilution of the Riley mark.

25.   As a result of MJ' acts, A2D has suffered, and is suffering, injury and damage in an amount yet to be determined.  Upon information and belief, the acts of MJ have

resulted and are currently resulting in substantial unjust profits and unjust enrichment on the part of MJ to which A2D is entitled in an amount yet to be determined. As a direct and proximate result of MJ's conduct, A2D has incurred and/or is entitled to damages including actual damages, lost profits and statutory damages. A2D seeks an accounting and damages.

## COUNT II.

### DILUTION AND INJURY TO BUSINESS REPUTATION

26. A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 25 above.

27. MJ's unauthorized reproduction and distribution of well logs containing the Riley mark demonstrate that MJ is diluting the exclusivity and distinction of the Riley mark in violation of Tex. Bus. & Comm. Code § 16.29. MJ's unauthorized use of the Riley mark, and use of its own mark, on inferior well logs diminishes the goodwill and reputation associated with Riley products bearing the Riley mark in violation of Tex. Bus. & Comm. Code § 16.29.

28. Moreover, upon information and belief, MJ's addition of its own mark, suggesting that it reproduced the well logs it provides its customers from original Riley logs and/or was authorized by Riley to reproduce such logs, is further calculated to diminish the good will and reputation associated with Riley products bearing the Riley mark.

29. MJ willfully intended to trade on Riley's goodwill and reputation and/or sought to cause dilution of the Riley mark.

## COUNT III.

## UNFAIR COMPETITION

30. A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 29 above.

31. MJ violated Texas common law prohibiting unfair competition by its unauthorized use of the Riley mark in connection with the reproduction and distribution of well logs, which is likely to cause confusion or misunderstanding as to affiliation, connection, or association with the goods and services of Riley (A2D).

32. Moreover, upon information and belief, MJ's addition of its own mark, suggesting that it reproduced the well logs it provides its customers from original Riley logs and/or was authorized by Riley to reproduce such logs, is further calculated to cause confusion and deceive its customers as to the origin of such well logs and/or Riley's (A2D's) sponsorship and/or approval of MJ's reproduction of the Riley logs. MJ's unauthorized use of the Riley mark, and use of its own mark, on inferior well logs diminishes the goodwill and reputation associated with Riley products bearing the Riley mark.

33. MJ willfully intended to trade on Riley's goodwill and reputation and/or sought to cause dilution of the Riley mark.

34. As a result of MJ's acts, A2D has suffered, and is suffering, injury and damage in an amount yet to be determined. Upon information and belief, the acts of MJ have resulted and are currently resulting in substantial unjust profits and unjust enrichment on the part of MJ to which A2D is entitled in an amount yet to be determined. As a direct and proximate result of MJ's conduct, A2D has incurred and is entitled to damages including actual damages, lost profits, and exemplary damages. A2D seeks an accounting and damages.

## COUNT IV.

## TORTIOUS INTERFERENCE WITH A CONTRACT

35.     A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 34 above.

36.     The contractual restrictions relating to Riley products specifically prohibit the reproduction of Riley well logs purchased by its customers. Moreover, Riley invoices generally state that the customer agrees not to transfer any image of a Riley log into any medium which permits the log to be reproduced or used by another for the purpose of resale or augmenting a competing database. The prohibition against reproduction was reinforced on the face of the Riley logs as illustrated in the well logs attached to Exhibit 1.

37.     Nevertheless, MJ ignored such prohibitions and blatantly reproduced Riley logs with the Riley mark and even adds its own mark suggesting that it reproduced the well logs from original Riley well logs and/or was authorized by Riley to reproduce such logs. Neither Riley nor A2D provided such logs to MJ. Based on MJ's unauthorized reproduction of the same well logs, MJ was aware of the prohibition against reproduction of the well logs bearing the Riley mark.

38.     On information and belief, despite its actual awareness of the reproduction restrictions, MJ willfully and intentionally interfered with A2D's contractual relationships as it improperly obtained and reproduced Riley logs by causing A2D's customers to breach these contractual restrictions. MJ had no interest in the contractual relationship between Riley and/or A2D and its customers and no legitimate justification or excuse for the interference.

39. A2D has been injured as a direct and proximate result of MJ's conduct, including lost revenues and opportunities, which A2D would have realized absent the interference.

40. As a result of MJ's tortious interference, A2D has suffered actual and consequential damages in the form of lost profits, lost sales, lost revenues, lost wages, lost income, and out-of-pocket expenses in an amount yet to be determined.

41. On information and belief, MJ's interference was committed intentionally, knowingly, and with callous disregard of A2D's legitimate rights with a specific intent to cause substantial injury or harm to A2D. A2D is entitled to recover exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the alleged actual damages.

## COUNT V.

## MISAPPROPRIATION

42. A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 41 above.

43. MJ is using logs created by Riley in direct competition with the services offered by A2D. Riley created its well log database through extensive time, labor, skill and money, which A2D purchased.

44. By its use of Riley products in competition with A2D, MJ has gained a special advantage in that competition because MJ is burdened with little or none of the expense incurred by Riley in the collection and production of these well logs.

45. As a result of MJ's misappropriation, A2D has suffered actual and consequential damages in the form of lost profits, lost sales, lost revenues, lost wages, lost income, and out-of-pocket expenses in an amount yet to be determined.

46. Upon information and belief, MJ's conduct was committed intentionally, knowingly, and with callous disregard of A2D's legitimate rights. Upon information and belief, MJ's conduct was committed with a specific intent by MJ to cause substantial injury or harm to A2D. A2D is entitled to recover exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages.

## COUNT VI.

### BREACH OF CONTRACT

47. A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 46 above.

48. MJ breached the terms of the 1984 Agreement by refusing to perform its obligations under the 1984 Agreement. Specifically, MJ continues to reproduce and distribute well logs that contain the Riley mark without using its best efforts to remove the Riley marks.

49. The breach by MJ was material because MJ did not substantially perform its material obligations under the 1984 Agreement.

50. A2D's injuries as a result of MJ's breach are a natural, probable and foreseeable consequence of the breach.

51. A2D seeks specific performance that MJ comply with its obligations set forth in the 1984 Agreement.

133 - 231754v3
000115/000002

- 12 -

52.     All conditions precedent for performance of the obligations under the 1984 Agreement have occurred.

## COUNT VII.

### INJUNCTIVE RELIEF

53.     A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 52 above.

54.     A2D seeks temporary and permanent injunctive relief pursuant to the claims alleged herein. Based on the facts alleged herein, there is a substantial likelihood that A2D will prevail on the merits.

55.     A2D has no adequate remedy at law or otherwise for the harm or damage done by MJ because A2D's business reputation will be irreparably damaged unless MJ is enjoined and/or ordered to perform its obligations under the 1984 Agreement. Moreover, such damage is difficult to quantify based on the damage to the goodwill and reputation associated with the Riley products bearing the Riley mark.

56.     A2D will suffer irreparable injury if MJ is not enjoined during the pendency of this lawsuit from the continued reproduction and distribution of well logs containing the Riley mark and from interfering with A2D's contracts with its customers.

57.     The threatened harm to A2D by MJ outweighs the harm a preliminary injunction would inflict on MJ because the prohibition against reproduction of Riley products bearing the Riley mark imposes a nominal burden on MJ as evidenced by its assumption of this obligation in the 1984 Agreement.

133 - 231754v3
000115/000002

58. Issuance of a preliminary injunction is not against the public interest because the public will still be able to purchase well logs from MJ—but without the risk of confusion.

59. A2D is willing to post a bond in the amount the court deems appropriate.

## COUNT VIII.

### ENHANCED/EXEMPLARY DAMAGES

60. A2D repeats and re-alleges as if fully set forth herein the allegations of paragraphs 1 through 59 above.

61. As MJ willfully intended to trade on Riley's reputation and/or sought to cause dilution of the Riley mark, A2D is entitled to recover an award above the amount found as actual damages, not exceeding three (3) times such amount, pursuant to 15 U.S.C. § 1117(a) and § 1125(c).

62. In addition, A2D seeks exemplary damages as a result of MJ's acts of unfair competition, tortious interference, and misappropriation. Upon information and belief, such acts were willful and done with a specific intent by MJ to cause substantial injury or harm to A2D.

## COUNT IX.

## ATTORNEYS' FEES AND COSTS

63. A2D repeats and realleges as if fully set forth herein, the allegations of paragraphs 1 through 62 above.

64. As a result of MJ's wrongful actions described above, A2D retained counsel to prosecute its claims.

65. As a result of the conduct described above, A2D is entitled to recover its reasonable and necessary attorneys' fees and costs incurred in the prosecution of this lawsuit pursuant to 15 U.S.C. § 1117 et seq. Tex. Civ. Prac. & Rem. Code ann. Ch. 38, and Rules 54 and 58 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, A2D prays that this Court:

1. Issue a temporary injunction after a hearing and a permanent injunction after a trial on the merits enjoining MJ and those acting in concert with it from:

   a) Representing to anyone or committing any acts calculated to cause members of the public to believe that MJ's goods or services have any authority, sponsorship, affiliation, or any connection with A2D or A2D's goods or services;

   b) Using, in any manner the mark or name Riley or Riley Electric Log, Inc., or any other words similar thereto that may cause, or may be likely to cause, confusion, mistake, or deception by the public, alone or in combination with any other word or words;

   c) Using any trademark, trade dress, service mark, name, logo, design or source designation of any kind on or in connection with MJ's goods or services that dilutes or is likely to dilute the distinctiveness of the trademarks, trade dress, service marks, names, or logos of A2D;

d) Passing off, palming off, or assisting in passing off or palming off, the Riley logs as those of MJ, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint;

e) From producing, distributing, circulating, selling, offering for sale, advertising or promoting any logs in digital or paper format created with Riley logs; and

f) Continuing MJ's unlawful acts as complained of herein.

2. Direct MJ to deliver for destruction all logs in digital or paper format or other items in MJ's possession or under its control that were created using Riley logs.

3. Direct MJ to pay A2D such damages as A2D has sustained as a consequence of MJ's wrongful acts;

4. Direct MJ to account for and return to A2D all monies, gains, profits, and advantages obtained by MJ due to MJ's wrongful acts;

5. Direct MJ to perform its obligations under the 1984 Settlement Agreement;

6. Direct MJ to pay A2D's reasonable and necessary attorneys' fees;

7. Direct MJ to pay pre-judgment and post-judgment interest at the highest rate allowed by law;

8. Direct MJ to pay A2D's costs and expenses of this action;

9. Direct MJ to pay A2D such enhanced and exemplary damages to which A2D may show itself justly entitled; and

10. Award A2D such other relief at law or in equity to which it may show itself justly entitled.

133 - 231754v3
000115/000002

- 16 -

## DEMAND FOR JURY TRIAL

A2D hereby demands that all issues be determined by a jury.

Dated this 16th day of May 2005.

>Respectfully submitted,
>**CRAIN, CATON & JAMES, P.C.**
>
>By: *[signature]*
>WILLIAM P. JENSEN, ESQ.
>(State Bar No. 10648250)
>Five Houston Center
>1401 McKinney, Suite 1700
>Houston, TX 77010-4035
>Telephone: (713) 658-2323
>Facsimile: (713) 658-1921
>ATTORNEYS FOR PLAINTIFF